IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

TRANSPORT WORKERS UNION OF    )   Civ. No. 08-00524 ACK-KSC
AMERICA,                      )
                              )
          Plaintiff,          )
                              )
     vs.                      )
                              )
HAWAIIAN AIRLINES, INC.,      )
                              )
          Defendant.          )
_____)

**ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

On November 21, 2008, Plaintiff, Transport Workers
Union of America ("Union"), filed a complaint against Defendant,
Hawaiian Airlines, Inc. ("Hawaiian" or "carrier"), seeking a
declaration that the carrier is in violation of the Railway Labor
Act ("RLA"), 45 U.S.C. § 151 et seq.[1]  The Union asserted that
Hawaiian offended RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, by
abrogating and repudiating a tentative agreement that the carrier
had recently made with the Union.  It further maintained that
Hawaiian's dealings with it were violative of RLA § 2 First, 45
U.S.C. § 152 First, because the carrier has refused to implement
the tentative agreement.  In addition to declaratory relief, the

_____

[1] The RLA "was extended in 1936 to cover the airline
industry."  Air Transp. Ass'n of Am. v. City & County of San
Francisco, 266 F.3d 1064, 1075 (9th Cir. 2001).  The parties
agree that the collective bargaining agreement in this case is
subject to the RLA and that this Court therefore has subject-
matter jurisdiction.  (Compl. ¶¶ 1-3, 5; Answer ¶ 1.)

Union also sought injunctive relief barring Hawaiian from abrogating and repudiating the tentative agreement and from dealing with it in contravention of RLA § 2 First, 45 U.S.C. § 152 First.

On December 18, 2008, the Union filed a motion for a preliminary injunction, accompanied by a memorandum in support ("Mem. in Supp."). On February 5, 2009, Hawaiian filed a memorandum in opposition to the motion ("Mem. in Opp'n"). On February 13, 2009, the Union filed a reply brief in support of its motion. On February 19, 2009, the Union and Hawaiian submitted their exhibits for the motion (respectively, "Union Ex." and "Hawaiian Ex."). On February 23 and 24, 2009, this Court held evidentiary hearings on the motion, and the following individuals provided testimony: Gary Shults, international representative for the Union; Elroy Kaneshiro, section chairman of one of the Union's locals; Janice Bumgarner, senior director of labor relations for Hawaiian; Lance Higa, senior director of system operations control for Hawaiian; and Peter Ingram, executive vice-president of finance and chief financial officer for Hawaiian. (Feb. 23, 2009 Transcript of Proceedings ("Tr.") 5:13-19 (Shults Test.), 86:15-16 (Kaneshiro Test.), 90:9-13 (Bumgarner Test.), 136:5-9 (Higa Test.), 168:16-20 (Ingram Test.).) During the February 23, 2009 hearing, the parties stipulated that all of the exhibits were admissible, and

2

this Court therefore ruled that the exhibits were admitted.  (<u>Id.</u> at 5:13-19.)  On March 23, 2009, the parties filed proposed findings of fact and conclusions of law.

Pursuant to Federal Rule of Civil Procedure 52(a)(2), this Court makes the following findings of fact and conclusions of law.  Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.  In view of this Court's findings and conclusions, the Union's motion for a preliminary injunction is denied.

**FINDINGS OF FACT**

1.   The Union and Hawaiian are parties to a collective bargaining agreement ("Collective Bargaining Agreement") covering Hawaiian flight dispatchers, whose responsibilities include route, fuel, and weather planning.  (<u>Id.</u> at 7:7-8:1 (Shults Test.); Hawaiian Ex. 101.)  The Collective Bargaining Agreement was most recently modified on November 12, 2004 and has remained in effect.  (Feb. 23, 2009 Tr. 8:9-12, 39:4-6 (Shults Test.), 103:10-17 (Bumgarner Test.).)  Employees covered by the Collective Bargaining Agreement continue to receive rates of pay, work rules, and benefits provided therein.  (<u>Id.</u> at 134:11-15 (Bumgarner Test.); Hawaiian Ex. 101.)

2.   The Union's constitution requires that agreements be ratified by the membership.  (Feb. 23, 2009 Tr. 29:18-19,

59:3-4, 59:22-60:2 (Shults Test.), 87:16-18 (Kaneshiro Test.);
Hawaiian Ex. 127 at 4.)  The Union takes the position that the
requirement of member ratification is entirely an internal rule.
(Feb. 23, 2009 Tr. 72:13-20, 73:16-22 (Shults Test.).)  Pursuant
to the Union's constitution, it is a condition of every
negotiation that the Union have the agreement ratified by the
Union's members.  (Id. at 60:3-6, 61:14-16 (Shults Test.),
87:16-18 (Kaneshiro Test.).)  The Union negotiators cannot accept
or sign an agreement without membership ratification.  (Id.
at 61:4-7, 62:7-21 (Shults Test.).)  There is thus no agreement
until the agreement has been ratified.  (Id. at 60:7-21,
61:21-62:9-19 (Shults Test.),[2/] 87:13-15, 87:19-24 (Kaneshiro
Test.).)  In fact, during the ratification process, the Union's
members have voted down agreements with Hawaiian in the past.
(Id. at 88:6-8 (Kaneshiro Test.).)

        3.   In September 2007, the Union served a notice on
Hawaiian pursuant to RLA § 6, 45 U.S.C. § 156, to amend the
Collective Bargaining Agreement.  (Id. at 10:13-21 (Shults
Test.).)  During negotiations, David Durkin, who was at the time
the president of one of the Union's locals, and Shults were the
primary spokespersons for the Union, while Bumgarner and Higa

---

        [2/] This Court credits Shults' deposition testimony as read
at the hearing as accurately describing the requirement of
membership ratification and the fact that there is no agreement
unless and until ratification occurs.

represented Hawaiian.  (Id. at 11:23-24, 12:2-3 (Shults Test.).)
The parties met in November 2007 and then in January and February
2008.  (Id. at 10:22-24, 11:21-22, 17:21-22 (Shults Test.).)
They did not meet again until the last week of October 2008.
(Id. at 18:13-14 (Shults Test.).)

        4.   Prior to the negotiations, Hawaiian negotiators
were instructed to obtain a "cost neutral" contract with the
Union.  (Id. at 91:1-7 (Bumgarner Test.), 169:1-12 (Ingram
Test.).)  Conceptually, under such an agreement, any increase in
the wages would be offset by savings to the carrier.  (Id.
at 12:17-22 (Shults Test.), 91:8-12 (Bumgarner Test.).)  Thus,
during the negotiations with the Union, Hawaiian negotiators told
Union negotiators that the carrier was seeking a "cost neutral"
agreement.  (Id. at 12:15-16 (Shults Test.), 137:16-138:1 (Higa
Test.).)  Union negotiators thus understood that Hawaiian had
taken the position that it desired a cost-neutral contract.  (Id.
at 12:23-25 (Shults Test.).)  However, Shults testified that the
Union negotiators did not agree to that position.  (Id.)  Apart
from the issue of cost neutrality, another significant concept
that arose during the bargaining process was ratification.
Consistent with the Union's constitution, Union negotiators told
Hawaiian negotiators that tentative agreements are subject to
membership ratification.  (Id. at 59:9-19 (Shults Test.).)
Hawaiian negotiators thus understood that, for a full agreement,

the agreement had to first be ratified.  (Id. at 96:8-11
(Bumgarner Test.).)

　　　　5.   In the November 2007 negotiations, the Union made
an initial proposal to Hawaiian regarding compensation.  (Id.
at 10:22-11:3 (Shults Test.); Union Ex. 1.)  The Union
specifically proposed annual wage increases of 5%, 3%, 3%, and
3%, with the first raise to take effect at the commencement of
the contract, as well as increases to certain "overrides," which
are additional payments to base salary that certain dispatchers
receive.  (Feb. 23, 2009 Tr. 11:4-11 (Shults Test.), 144:3-5
(Higa Test.); Union Ex. 1.)  This proposal was neither accepted
nor withdrawn during the November 2007 negotiations.  (See Feb.
23, 2009 Tr. 19:6-7 (Shults Test.).)

　　　　6.   In the January and February 2008 negotiations,
Hawaiian explained that it intended to implement a new flight
planning system that would be administered by a "key user," a
position that fell within the scope of the Collective Bargaining
Agreement.  (Id. at 16:1-4 (Shults Test.).)  The carrier stated
that it required one-and-one-half people for the system.  (Id.
at 16:5-7 (Shults Test.).)  Consequently, Hawaiian proposed that
it would make one position a Union position and hire a management
person to perform one-half of a Union key user position.  (Id.
at 16:7-10 (Shults Test.).)  The parties made a side agreement
that the one-half of a Union key user position was worth $30,000

and that the amount would be applied in a future agreement towards wage increases.  (Id. at 16:11-15, 17:21-18:3, 51:20-22 (Shults Test.), 140:9-24 (Higa Test.).)  In addition to discussing the key user position, the parties also addressed the question of compensation.  Durkin said to Higa, "[L]ook, we are not even going to take [a tentative agreement] out for ratification unless it has at least [a 2%-2.5% annual increase in wages]."  (See id. at 43:22-44:1, 44:18-23 (Shults Test.); Hawaiian Ex. 107.)  However, the parties did not reach an agreement as to compensation during the January and February 2008 negotiations.  (Feb. 23, 2009 Tr. 18:21-22, 19:2-3 (Shults Test.).)

      7.   When negotiations resumed in October 2008, the parties had, by that point, made tentative agreements regarding certain aspects of sick leave accrual and health benefits.  (Id. at 18:15-19:1 (Shults Test.).)  The major remaining issue was compensation.  (Id. at 18:21-22, 19:2-3 (Shults Test.).)  The Union's initial offer of annual wages increases of 5%, 3%, 3%, and 3% was still on the table.  (Id. at 19:6-7 (Shults Test.).) As the negotiations commenced, Hawaiian proposed the elimination of the position of interisland coordinator from the Union's bargaining unit.  (Id. at 19:8-12 (Shults Test.).)  The interisland coordinator's job functions include routing the airplanes and scheduling the airplanes for maintenance.  (Id.

at 19:13-16 (Shults Test.).)  Under the carrier's proposal, the Union would permanently lose three Union positions under the Collective Bargaining Agreement, as the positions would be reclassified as management positions.  (Id. at 19:23-20:5, 21:2-21 (Shults Test.).)  The loss of three positions would result in a 10% reduction in positions under the Collective Bargaining Agreement, because the bargaining unit only had a total of thirty positions.  (Id. at 14:8-22 (Ingram Test.).)  The Union negotiators responded that, if the carrier wanted the positions, it would have to buy them through an increase in wages for the Union members who remained under the Collective Bargaining Agreement.  (Id. at 21:4-5, 22:10-14 (Shults Test.).)

        8.   On October 31, 2008, a Hawaiian negotiator offered that, if the Union would agree to take the interisland coordinator out of the bargaining unit, the carrier would provide 2.34% plus 1% (in total, 3.34%) annual wage increases for four years, with the first raise taking effect at the commencement of the contract, as to the dispatchers who remained in the bargaining unit.  (Id. at 23:6-12, 23:16-25, 24:20-25 (Shults Test.).)  A Hawaiian negotiator specifically wrote 2.34% plus 1% on a whiteboard four times for each year of the four-year contract.  (Id. at 24:11-19 (Shults Test.).)  Although Hawaiian did not explain the breakdown of these figures during the October 2008 negotiations, it appears that the 2.34% represented the

8

value that Hawaiian had placed on the interisland flight coordinator position and the 1% represented the value of having a contract that extended to the end of 2012.  (Id. at 76:2-25 (Shults Test.), 96:12-19 (Bumgarner Test.).)  Hawaiian had previously informed the Union that it was offering all unions a 1% yearly increase in wages if they would extend their contracts to the end of 2012.  (Id. at 96:12-19 (Bumgarner Test.).)

9.   Apart from the interisland coordinator position and the 2012 extension, the Union's other concessions, including the key user and sick leave accrual agreements, were valued between a 3% and 4% wage increase for the dispatchers.  (Id. at 25:6-12 (Shults Test.).)  Thus, the value of interisland coordinator position and the 2012 extension (3.34%) plus the other concessions (3%-4%) amounted to approximately a 7% annual wage increase.  (Id. at 25:6-14 (Shults Test.).)  However, Hawaiian then reevaluated its calculation because the other concessions were comprised in part by the agreement regarding sick leave, which was supposed to provide a one-time, as opposed to annual, payout.  (Id.)  Consequently, Hawaiian proposed an annual wage increase of 5.69%.  (Id. at 25:6-14 (Shults Test.), 153:12, 155:11-12 (Higa Test.).)

10.   Durkin countered to the Hawaiian negotiators that "he would be willing to take it back to the members if we could get it to a total of 6 percent."  (Id. at 25:19-23 (Shults

9

Test.); <u>cf.</u> <u>id.</u> at 153:12-13, 155:13-15 (Higa Test.).)   The
Hawaiian negotiators left the room and, upon their return, stated
that they would agree to 6%. (Dec. 23, 2009 Tr. 25:23-26:5
(Shults Test.).)   At the time, the Hawaiian negotiators believed
that they were achieving a cost neutral contract with the
exception of a negligible amount (the difference between 5.69%
and 6%) "to get to the point where [the Union negotiators] would
take [a tentative agreement] to ratification." (<u>Id.</u> at 154:6-7,
155:6-19 (Higa Test.).)   Union negotiators thereafter asked if
they could take 0.15% of the 6% as well as a portion of the one-
time payment for accrued sick leave and apply it to increase
certain "overrides," which, as stated previously, are payments in
addition to base salary that certain dispatchers receive. (<u>Id.</u>
at 26:7-12 (Shults Test.), 144:3-5, 154:10-17 (Higa Test.).)
Hawaiian agreed to the change. (<u>Id.</u> at 26:7-12 (Shults Test.),
154:10-17 (Higa Test.).)

        11.  After the allocation, what remained of the 6% was
a 5.85% annual wage increase. (<u>Id.</u> at 26:15-16 (Shults Test.).)
The Hawaiian negotiators left the negotiating room again to
verify the 5.85% figure and, upon returning, Bumgarner asked,
"[D]o we have a deal?" (<u>Id.</u> at 26:20-28:2 (Shults Test.).)   The
parties shook hands, and Shults, a Union representative, drafted
a term document, labeling it as "HAL Dispatchers Tentative
Agreement 10-31-08" ("Tentative Agreement"). (<u>Id.</u> at 28:2-3,

29:24-30:4 (Shults Test.); Union Ex. 2.)   Shults memorialized

that the effective date of the amendment to the Collective

Bargaining Agreement would be the "DOS," which stood for date of

signing.  (Feb. 23, 2009 Tr. 11:12-20 (Shults Test.); Union

Ex. 2.)  The date of signing is when the parties sign an official

agreement, which would occur only if the Tentative Agreement were

ratified.  (Feb. 23, 2009 Tr. 30:24-31:5, 68:20-23, 83:11-17

(Shults Test.).)  The Tentative Agreement does not contain any

provision requiring member ratification.  (Id. at 32:1-4 (Shults

Test.); Union Ex. 2.)  However, when the parties signed or

initialed the Tentative Agreement, it was still a tentative

agreement subject to ratification.  (Feb. 23, 2009 Tr. 30:5-15,

61:8-10, 61:19-20 (Shults Test.).)  The Tentative Agreement would

not become final unless and until it was ratified.  (Id.

at 61:11-13 (Shults Test.).)

     12.  Hawaiian negotiators asked if the Union

negotiators thought that the Tentative Agreement would pass

ratification and if the Union negotiators would support the

Tentative Agreement.  (Id. 29:6-7, 58:5-9, 73:16-19 (Shults

Test.).)  The Union negotiators said that they thought that the

Tentative Agreement would pass and that they would support it.

(Id. at 29:7-8, 58:10-11 (Shults Test.).)  At that time, the

parties had an understanding that the Tentative Agreement had to

be ratified and that, if it were not ratified, there would be no

agreement.  (Id. at 29:14–16, 84:23–85:17 (Shults Test.).)  In fact, Shults reiterated that tentative agreements are subject to membership ratification.  (Id. at 59:9–16 (Shults Test.).)  After the parties signed or initialed the Tentative Agreement, the Union could not guarantee that the amendment to the Collective Bargaining Agreement would be ratified and become final.  (Id. at 60:22–25 (Shults Test.).)  Indeed, if ratification had failed, the Union negotiators expected to return to the bargaining table to continue negotiations.  (Id. at 61:1–3 (Shults Test.).)

13.  Following the negotiations, Bumgarner sent an e-mail to upper-level Hawaiian managers, advising them that the parties had entered a Tentative Agreement that was a "flat contract except for a 1% increase per year for extending through 2012," and that "[t]here are no changes from what has been reviewed with you."  (Id. at 102:5–17, 121:7–20 (Bumgarner Test.); Union Ex. 11 at 1.)  Hawaiian senior vice president of operations, Charles Nardello, responded, "Great work.  Thank you all," and Hawaiian president, Mark Dunkerly, replied, "I echo Charlie's sentiments.  Well done to the team."  (Feb. 23, 2009 Tr. 125:8–18 (Bumgarner Test.); Union Ex. 11 at 1–2.)

14.  On November 2, 2008, Hawaiian's chief financial officer, Peter Ingram, discovered a valuation error in the Tentative Agreement.  (Feb. 23, 2009 Tr. 130:11–13 (Bumgarner Test.), 169:13–170:1–8 (Ingram Test.).)  The savings that the

carrier had achieved under the Tentative Agreement were only sufficient to provide <u>one initial</u> increase in pay; the savings could not fund the <u>four annual</u> increases in pay that were provided by the Tentative Agreement.  (<u>Id.</u> at 155:22-156:12 (Higa Test.), 173:15-174:14 (Ingram Test.).)  This discrepancy arose because, in Higa's calculations during the negotiations, he overlooked the fact that a pay increase in year one of the Tentative Agreement was embedded in the contract and that the savings used to fund the increase only offset the initial increase but not any additional increases.  (<u>Id.</u> at 99:17-22, 127:1-15 (Bumgarner Test.), 151:12-21 (Higa Test.), 174:18-20 (Ingram Test.); Hawaiian Ex. 129.)

        15.  In light of the error, the Tentative Agreement was not "cost neutral."  (Feb. 23, 2009 Tr. 174:15-17 (Ingram Test.).)  According to Hawaiian, the difference between the Tentative Agreement that its negotiators accepted and what it intended is approximately $735,000.  (<u>Id.</u> at 173:13-174:17 (Ingram Test.); Hawaiian Ex. 129.)  A one-time 5.85% increase would have been equivalent to the value obtained by the carrier. (Feb. 23, 2009 Tr. 172:21-173:12 (Ingram Test.); Hawaiian Ex. 129.)  Thus, the Tentative Agreement will cost Hawaiian approximately $735,000 over the term if Hawaiian is required to implement it.  (Feb. 23, 2009 Tr. 174:6-14 (Ingram Test.).)

16.   Bumgarner called Durkin to inform him of the mistake and asked that the Union return to negotiations.  (Id. at 100:13-19 (Bumgarner Test.).)  In addition, Higa called Kaneshiro, who had attended the October negotiations, and explained that the Tentative Agreement had a valuation error and that the carrier could not honor the Tentative Agreement.  (Id. at 86:15-20, 88:19-24 (Kaneshiro Test.), 156:25-157:5 (Higa Test.).)

17.   On November 3, 2008, the negotiators for Hawaiian again called Durkin and stated that they had made an error in their calculations, that they wanted to go back to the bargaining table, and that the Union should not proceed with the ratification vote.  (Id. at 88:25-89:6 (Kaneshiro Test.), 100:20-101:7 (Bumgarner Test.).)  Durkin responded that the Union would proceed with the vote.  (Id. at 101:5-7 (Bumgarner Test.).) Later that day, Hawaiian negotiators called Durkin a second time and again explained the calculation error.  (Id. at 101:8-102:4 (Bumgarner Test.).)  Durkin responded that he could not change the Tentative Agreement, that the Union negotiators would lose credibility if he did, and that Hawaiian would have to litigate the issue.  (Id. at 102:2-4 (Bumgarner Test.).)

18.   Also on November 3, 2008, Hawaiian sent a letter to the Union reiterating that its negotiators had made a valuation error.  (Id. at 36:22-37:15 (Shults Test.); Union Ex. 3

14

at 1.)  The carrier asserted that, in light of the error, the proper course of action was to return to the bargaining table and conclude an agreement based upon proper valuations.  (Union Ex. 3 at 2.)  On November 4, 2008, the Union replied to Hawaiian's letter, acknowledging that Hawaiian did not intend to honor the Tentative Agreement and asserting that the Union was in the ratification process.  (Feb. 23, 2009 Tr. 66:17-24 (Shults Test.); Union Ex. 4 at 1-2.)  The Union did not contend that it had a final and binding agreement.  (Feb. 23, 2009 Tr. 66:17-24 (Shults Test.); Union Ex. 4 at 1-2.)  On November 6, 2008, the Union advised Hawaiian that the Tentative Agreement had been ratified and called on the carrier to implement the new pay rates.  (Feb. 23, 2009 Tr. 36:22-37:2, 37:20-25, 58:16-18 (Shults Test.).)

    19.  To date, Hawaiian has not signed an agreement memorializing the Tentative Agreement or implemented the changes to the Collective Bargaining Agreement that were contemplated by the Tentative Agreement.  (Id. at 38:4-8, 39:4-8 (Shults Test.).) The non-implementation of the Tentative Agreement can be measured entirely in monetary form.  Any losses to the employees can be easily and readily quantified.  The Union did not introduce any evidence that its members at Hawaiian will suffer irreparable injury if injunctive relief is not granted.  By contrast, if an injunction is granted improvidently, it would be very difficult

to restore the status quo because the interisland coordinator positions would have been eliminated.  (See Union Ex. 2 at 1.)

## CONCLUSIONS OF LAW

**I.    Injunctive Relief Under the RLA and the NLGA**

1.    The Union has moved for a preliminary injunction to enjoin Hawaiian from abrogating and refusing to implement the Tentative Agreement in contravention of RLA § 2 Seventh, 45 U.S.C. § 152 Seventh.  (Mem. in Supp. 1.)[3/]  It asserts that, because Hawaiian has unlawfully violated that provision and the Tentative Agreement constitutes the status quo, it need not show irreparable harm or that the balance of hardships tips in its favor.  (Id. at 32–34.); see also Consol. Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 302–03 (1989).

2.    As a general matter, the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 et seq., prohibits federal courts from granting injunctive relief in "labor disputes" such as this one, except in "strict conformity" with its requirements.  See 29

---

[3/] In its memorandum in support of its motion for a preliminary injunction, the Union also asserts that Hawaiian has violated RLA § 2 First, 45 U.S.C. § 152 First.  (Mem. in Supp. 1.)  However, the Union is no longer relying on RLA § 2 First, 45 U.S.C. § 152 First, for purposes of its motion.  It did not raise the provision during its closing argument at the February 24, 2009 hearing.  (Feb. 24, 2009 Tr. 25:17–49:24, 71:15–72:5 (Union's closing argument).)  More importantly, in its proposed findings and conclusions, the Union states that, "[f]or purposes of the preliminary injunction, [the Union] is not relying on its claim that the Carrier violated RLA Section 2 First."  (Union's Proposed Findings of Fact and Conclusions of Law 19.)

U.S.C. § 101 ("No court of the United States, as herein defined, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act . . . ."); id. § 113(c) ("The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.").

  3. In order to obtain injunctive relief under the NLGA, a court must find:

   (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained . . . ;

   (b) That substantial and irreparable injury to complainant's property will follow;

   (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

   (d) That complainant has no adequate remedy at law; and

   (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.

4.    Still, "[e]ven if a dispute is a labor dispute under Norris-LaGuardia, a federal court may issue an injunction . . . if the [RLA] provides the procedure for resolving the dispute." Burlington N. & Santa Fe Ry. v. Int'l Bhd. of Teamsters Local 174, 203 F.3d 703, 713 (9th Cir. 2000); see also Burlington N. R.R. v. Bhd. of Maintenance of Way Employees, 481 U.S. 429, 444 (1987) ("In certain limited circumstances, the Norris-LaGuardia Act does not prevent a court from enjoining violations of the specific mandate of another labor statute."); Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 40 (1957) ("We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved.").

5.    "'Case law tends to classify disputes that arise between carriers and employee unions under the RLA as either "major" or "minor."'" Ass'n of Flight Attendants v. Horizon Air Indus., 280 F.3d 901, 904 (9th Cir. 2002) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. Alaska Airlines, 813 F.2d 1038, 1039 (9th Cir. 1987)).  "Major disputes are those arising 'out of the formation or change of collective bargaining agreements covering rates of pay, rules, or working conditions.'" Fennessy

<u>v. Sw. Airlines</u>, 91 F.3d 1359, 1361 (9th Cir. 1996) (quoting

<u>Atchison Topeka & Santa Fe Ry. Co. v. Buell</u>, 480 U.S. 557, 562-63

(1987)) (brackets omitted).  One of the statutory bases for major

disputes is RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, which

directs that "no carrier 'shall change the rates of pay, rules,

or working conditions of its employees, as a class, as embodied

in agreements except in the manner prescribed in such agreements'

or through the mediation procedures established in [RLA] § 6[, 45

U.S.C. § 156]."  <u>Consol. Rail</u>, 491 U.S. at 302 (quoting 45 U.S.C.

§ 152 Seventh).  "Minor disputes, on the other hand, concern the

interpretation or application of collective bargaining agreements

and are resolved through binding arbitration before the System

Board of Adjustment."  <u>Ass'n of Flight Attendants</u>, 280 F.3d

at 904 (quoting <u>Int'l Ass'n of Machinists & Aerospace Workers</u>,

813 F.2d at 1040).

        6.   In <u>Consolidated Rail</u>, the Supreme Court discussed

injunctive relief in major-dispute cases as follows:

> In the event of a major dispute, the RLA
> requires the parties to undergo a lengthy
> process of bargaining and mediation.  §§ 5
> and 6.  Until they have exhausted those
> procedures, the parties are obligated to
> maintain the status quo, and the employer may
> not implement the contested change in rates
> of pay, rules, or working conditions.  The
> district courts have subject-matter
> jurisdiction to enjoin a violation of the
> status quo pending completion of the required
> procedures, without the customary showing of
> irreparable injury.  <u>See Detroit & T.S.L.R.</u>
> <u>Co. v. Transportation Union</u>, 396 U.S. 142

> (1969) (upholding status quo injunction
> without discussing equitable constraints);
> <u>Division No. 1, Detroit, Brotherhood of</u>
> <u>Locomotive Engineers v. Consolidated Rail</u>
> <u>Corp.</u>, 844 F. 2d 1218 (CA6 1988). Once this
> protracted process ends and no agreement has
> been reached, the parties may resort to the
> use of economic force.

<u>Consol. Rail</u>, 491 U.S. at 302-03 (footnote omitted).

## II.  Unlawful Acts

7.   The Union asserts that this case concerns a major dispute, as Hawaiian is, within the meaning of 29 U.S.C. § 107(a), "unlawful[ly]" violating a status-quo provision, RLA § 2 Seventh, 45 U.S.C. § 152 Seventh.[4/]  (Mem. in Supp. 1, 13; Feb. 24, 2009 Tr. 6-12 (Union's closing argument).)  That provision, as previously stated, directs that "[n]o carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in [RLA § 6, 45 U.S.C. § 156]."  45 U.S.C. § 152 Seventh.  The Union asserts that Hawaiian has violated this provision by abrogating and refusing to implement the Tentative Agreement, which embodies the status quo.  (Mem. in Supp. 14-32.)  Hawaiian

---

[4/]   <u>See</u> <u>CSX Transp. v. United Transp. Union</u>, 86 F.3d 346, 351 (4th Cir. 1996) (observing that violations of an RLA arbitration provision, 45 U.S.C. § 153, may constitute "'unlawful acts'" for purposes of obtaining injunctive relief under the NLGA (quoting 29 U.S.C. § 107)).

agrees that this matter arises out of a major dispute,[5] but asserts that the Tentative Agreement is invalid, such that its refusal to implement the Tentative Agreement did not offend RLA § 2 Seventh, 45 U.S.C. § 152 Seventh. (Feb. 24, 2009 Tr. 51:2-17 (Hawaiian's closing argument); Mem. in Opp'n 28-35.)  The central question is thus whether the Tentative Agreement is enforceable and therefore constitutes the status quo.

        8.   "The question of contract formation under the Railway Labor Act does not involve problems of statutory interpretation unique to the plan of the RLA," and, as such, a court may "refer to the law developed over the last half-century 'administering our most comprehensive national labor scheme, the National Labor Relations Act,' 29 U.S.C. § 151 et seq." E. Air Lines, Inc. v. Air Line Pilots Ass'n, 861 F.2d 1546, 1550 (11th Cir. 1988) (quoting Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383 (1969)).  "As under the National Labor Relations Act, [the court's] resolution of this contract-formation dispute is guided by the general common law of contracts.  In light of the important federal policy favoring the

_____

        [5] This Court agrees with the parties that this case involves a major dispute.  If the Tentative Agreement were found to be valid, then Hawaiian's refusal to honor the Tentative Agreement would constitute a unilateral effort to "change the rates of pay . . . of its employees, as a class as embodied in [Tentative Agreement]," in contravention of RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, which, as previously noted, is one of the statutory bases for major disputes.  See Consol. Rail, 491 U.S. at 302.

existence of collective-bargaining agreements, however, contract law may be given a liberal interpretation." Id. (citing, inter alia, John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 550 (1964)).

9.   In the case at hand, Hawaiian asserts that the Tentative Agreement is invalid because the carrier timely exercised its right to withdraw its assent to the Tentative Agreement, as the Tentative Agreement was subject to a condition precedent.  (See Mem. in Opp'n 32-35.)   The condition precedent defense is an affirmative defense, and Hawaiian therefore bears the burden of showing that it will likely succeed at trial.  See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1158 (9th Cir. 2007) ("Because 'the burdens at the preliminary injunction stage track the burdens at trial,' once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the nonmoving party to show a likelihood that its affirmative defense will succeed." (quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006))); Dist. 17, United Mine Workers of Am. v. Apogee Coal Co., 13 F.3d 134, 137 (4th Cir. 1993) (explaining that, in deciding a motion for a preliminary injunction under 29 U.S.C. § 107, "the general standard applicable for determining the appropriateness of a preliminary injunction" applies, but that the general standard and 29 U.S.C. § 107 "are not co-

extensive because the [NLGA] imposes additional requirements");

Da Hua Non-Ferrous Metals Co. v. W.D. Mask Cotton Co., No. 96-5430, 1997 U.S. App. LEXIS 10644, at *8 (6th Cir. May 6, 1997) (unpublished opinion).[6/]

---

[6/] Hawaiian did not raise the condition precedent defense in its answer.  It appears that the first time the carrier asserted the defense was in its memorandum in opposition to the Union's motion for a preliminary injunction.  (Mem. in Opp'n 28-35.)

"Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived."  Morrison v. Mahoney, 399 F.3d 1042, 1046 (9th Cir. 2005) (citing Fed. R. Civ. P. 8(c); Fed. R. Civ. P. 12(b); Fed. R. Civ. P. 12(g)).  Federal Rule of Civil Procedure 8(c) ("Rule 8(c)") provides that, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  As previously stated, the condition precedent defense is an affirmative defense because "it is 'a matter constituting avoidance or affirmative defense.'"  Da Hua Non-Ferrous Metals, 1997 U.S. App. LEXIS 10644, at *8 (quoting Fed. R. Civ. P. 8(c)) (citing Elston-Richards Storage Co. v. Indem. Ins. Co. of N. Am., 194 F. Supp. 673, 678 (W.D. Mich. 1960)).  Therefore, in the case at bar, Hawaiian was required by Rule 8(c) to raise the condition precedent defense in its answer.

Still, the Ninth Circuit has explained that, "[a]lthough Rule 8 requires affirmative defenses to be included in responsive pleadings, absent prejudice to the plaintiff an affirmative defense may be plead for the first time in a motion for summary judgment."  Ledo Fin. Corp. v. Summers, 122 F.3d 825, 827 (9th Cir. 1997); accord Healy Tibbitts Constr. Co. v. Ins. Co. of N. Am., 679 F.2d 803, 804 (9th Cir. 1982) (per curiam).  This Court perceives no reason why a similar rule should not apply as to an opposition to a motion for a preliminary injunction.  Thus, absent prejudice to the plaintiff, an affirmative defense may be plead for the first time in an opposition to a motion for a preliminary injunction.

In this case, the Union has not claimed any prejudice by virtue of Hawaiian's failure to raise the affirmative defense of condition precedent in its answer.  Indeed, the Union emphasized the facts underlying the condition precedent defense in its complaint and explicitly addressed the defense in its motion for a preliminary injunction.  (Compl. ¶¶ 9-14; Mem. in Supp. 15-18.)

(continued...)

10.   An employer may withdraw its assent to a contract before a union's members ratify the contract if ratification is a condition precedent to the contract coming into being.  <u>Teledyne Specialty Equip.</u>, 327 N.L.R.B. 928, 928 n.1, 930 (1999); <u>Sunderland's, Inc.</u>, 194 N.L.R.B. 118, 118 n.1, 124 (1971).  Such ratification is a condition precedent where the requirement of ratification is agreed to by the parties.  <u>See</u> <u>Nat'l Labor Relations Bd. v. Gen. Teamsters Union Local 662</u>, 368 F.3d 741, 745 (7th Cir. 2004); <u>Nat'l Labor Relations Bd. v. Roll & Hold Div. Area Transp. Co.</u>, 957 F.2d 328, 331 (7th Cir. 1992).  Three of the National Labor Relations Board's decisions are instructive in defining the contours of this rule.  <u>See</u> <u>E. Air Lines</u>, 861 F.2d at 1150.

11.   In the first case, <u>Sheridan Manor Nursing Home, Inc.</u>, 329 N.L.R.B. 476 (1999), a union negotiator said throughout the course of negotiations that the contract had to be ratified. <u>Id.</u> at 478 n.9, 482.  The board held that a union negotiator's statements had not made ratification a condition precedent to the parties' "tentative agreement."  <u>Id.</u>  The board explained that, even if the union negotiator's statements arguably may have led the employer to believe that the union would conduct a vote of

---

⁶/(...continued)
Under the circumstances, this Court concludes that the affirmative defense of condition precedent was not waived.  <u>Cf.</u> <u>Ledo</u>, 122 F.3d at 827.

the bargaining unit, there was never any such agreement as to ratification between the parties.  Id. at 478 n.9.

12.  In the second case, Observer-Dispatch, 334 N.L.R.B. 1067 (2001), at the close of negotiations between an employer and a union, an employer negotiator asked a union bargaining unit member whether the parties had an agreement.  Id. at 1071.  The member responded that, aside from certain wording changes, he had no problem with the proposal, but that he wanted to take the proposal back to the rest of the bargaining unit for a vote.  Id.  An official union negotiator then stated that the proposal looked good, but that he had to take the agreement back to the membership for a vote.  Id.  The employer's negotiator asked whether the employer could consider that a tentative agreement had been reached, and the union negotiator responded that the proposal looked good and that they had a "tentative agreement."  Id. at 1071.  The board affirmed an administrative law judge's decision that the union negotiator's statements had made ratification by the membership a condition precedent to the formation of an agreement.  Id. at 1067, 1072–73.  The judge reasoned that, under the circumstances, the characterization of the agreement as "tentative" was meaningful and not merely a verbal gloss.  Id. at 1073.

13.  In the last case, Valley Central Emergency Veterinary Hospital, 349 N.L.R.B. 1126 (2007), a union and an

employer conducted contract negotiations with a mediator.   Id. at 1131.   During the negotiations, a union negotiator told the mediator that, if the employer agreed to a particular provision, the union would recommend that the members ratify the agreement. Id. at 1126, 1132.   The board agreed with an administrative law judge's finding that the statement did not make member-ratification a condition precedent to the creation of a contract. Id. at 1126.   The judge reasoned, inter alia, that there was no evidence that the employer's representatives responded to the union negotiator's statement or that there was any discussion about the statement during the negotiations.   Id. at 1132.

14.   Coming back to the case at hand, under the Union's constitution, any proposed tentative agreement is subject to ratification by the members.   (Feb. 23, 2009 Tr. 29:18-19, 59:3-4, 59:22-60:2 (Shults Test.), 87:16-18 (Kaneshiro Test.); Hawaiian Ex. 127 at 4.)   As such, Union negotiators cannot accept an agreement without membership ratification, and there is no agreement until a proposed agreement has been ratified.   (Feb. 23, 2009 Tr. 60:7-21, 61:4-7, 62:9-19 (Shults Test.), 87:13-15, 87:18-24 (Kaneshiro Test.).)   Consistent with the Union's constitution, the Union negotiators told Hawaiian negotiators during their negotiations that tentative agreements are subject to membership ratification.   (Id. at 59:9-19 (Shults Test.).) Therefore, the Hawaiian negotiators had an understanding that,

for a full contract, any tentative agreement had to first be
ratified.  (<u>Id.</u> at 96:8-11 (Bumgarner Test.).)

15.   In addition to advising Hawaiian of the Union's
ratification requirement, Durkin, a Union negotiator, premised
certain offers on that requirement in an apparent effort to
obtain leverage over the Hawaiian negotiators.  In the January
2008 negotiations, the parties discussed the issue of
compensation.  In those discussions, Durkin said to Higa, a
Hawaiian negotiator, "[L]ook, we are not even going to take [a
tentative agreement] out for ratification unless it has at least
[a 2%-2.5% annual increase in wages]."  (<u>Id.</u> at 44:18-23 (Shults
Test.); Hawaiian Ex. 107.)  Thus, Durkin's proposal was, in
effect, that, if Hawaiian would provide a certain increase in
compensation, he would take the proposal to the members for
ratification, which would be a condition precedent to an
agreement.  (<u>See</u> Feb. 23, 2009 Tr. 44:18-23 (Shults Test.);
Hawaiian Ex. 107.)

16.   Durkin made a similar statement on the final day
of negotiations, October 31, 2008.  (Feb. 23, 2009 Tr. 25:19-23
(Shults Test.); <u>cf. id.</u> at 155:13-15 (Higa Test.).)  By that
point, Hawaiian had offered an annual wage increase of 5.69%.
(Feb. 23, 2009 Tr. 25:6-14 (Shults Test.), 155:11-12 (Higa
Test.).)  Durkin countered to the Hawaiian negotiators that "he
would be willing to take it back to the members if we could get

it to a total of 6 percent." (<u>Id.</u> at 25:19-23 (Shults Test.);
<u>cf. id.</u> at 153:12-13, 155:13-15 (Higa Test.).)  Durkin's offer
was not that the Union would accept outright Hawaiian's proposal
if the carrier would agree to provide 6%.  (<u>See id.</u> at 25:19-23
(Shults Test.).)  Rather, it was that he would take Hawaiian's
proposal to the Union's members for a ratification vote if the
carrier would agree to provide 6%.  (<u>See id.</u>)  Durkin's offer is
thus similar to the union negotiator's acceptance in <u>Observer-
Dispatch</u>, insofar as the union negotiator in that case made
ratification a component of his acceptance.  <u>See</u> 334 N.L.R.B.
at 1067.

     17.  In response to Durkin's offer, the Hawaiian
negotiators left the room and, upon returning, the Hawaiian
negotiators said that they would agree to 6%.  (Feb. 23, 2009
Tr. 25:23-26:5 (Shults Test.).)  The Hawaiian negotiators
specifically agreed to the 0.31% increase in order "to get to the
point where [the Union negotiators] would take [a tentative
agreement] to ratification."  (<u>Id.</u> at 154:6-7, 155:6-19 (Higa
Test.).)  Hence, unlike the employer's representatives in <u>Valley
Central Emergency Veterinary Hospital</u>, who never responded to the
union negotiator's offer to recommend that an agreement be
ratified in exchange for a particular contract provision,
Hawaiian's negotiators accepted Durkin's offer to take a

tentative agreement to the membership for ratification if Hawaiian would agree to provide 6%.  <u>See</u> 349 N.L.R.B. at 1132.

     18.  To be sure, a portion of the 6% annual wage increase to base salaries was thereafter allocated to overrides, but the total amount of compensation that Hawaiian agreed to did not change from the point that it accepted Durkin's offer.  (Feb. 23, 2009 Tr. 26:7-12 (Shults Test.), 144:3-5, 154:10-17 (Higa Test.).)  Following that allocation and an additional verification of the base salary increases by the Hawaiian negotiators, the parties signed or initialed a term document.  (<u>Id.</u> at 26:20-28:2, 28:2-3, 29:24-30:4 (Shults Test.).)  Shults, a Union representative, drafted the document and labeled it as a "Tentative Agreement."  (<u>Id.</u> at 28:2-3, 29:24-30:4 (Shults Test.); Union Ex. 2.)  Shults memorialized that the effective date of the amendment to the Collective Bargaining Agreement would be the "DOS," which stood for date of signing.  (Feb. 23, 2009 Tr. 11:12-20 (Shults Test.).)  The date of signing is when the parties sign an official agreement, which would occur only if the Tentative Agreement were ratified.  (<u>Id.</u> at 30:24-31:5, 68:20-23, 83:11-17 (Shults Test.).)

     19.  At that point, the parties had an understanding that the Tentative Agreement had to be ratified and that it would not become a final agreement unless and until it was ratified by the Union's members.  (<u>Id.</u> at 29:14-16, 61:11-13, 84:23-85:17

(Shults Test.).)  Hawaiian negotiators thus asked if the Union negotiators thought that the Tentative Agreement would pass ratification and if the Union negotiators would support the Tentative Agreement.  (Id. at 29:6-7, 58:5-9, 73:16-19 (Shults Test.).)  The Union negotiators said that they thought the Tentative Agreement would pass and that they would support it. (Id. at 29:7-8, 58:10-11 (Shults Test.).)  Hawaiian's concern regarding ratification was well-founded because, in the past, the Union's members have voted down agreements with Hawaiian during the ratification process.  (Id. at 88:6-8 (Kaneshiro Test.).)  In view of the ratification component of the Tentative Agreement, it appears that the parties characterized the agreement as only "tentative" because it was necessary for the agreement to be ratified by the Union's membership.  As was true in Observer-Dispatch, the parties' use of the word "tentative" was meaningful and not merely a verbal gloss.  See 334 N.L.R.B. at 1071-72.

        20.  Under the circumstances, this Court concludes that Hawaiian has shown a likelihood of success on its claim that ratification by the Union's members was a condition precedent to the formation of a contract.  That being the case, Hawaiian was entitled to withdraw its assent to the Tentative Agreement prior to the Union's ratification.  See id.; Teledyne Specialty Equip., 327 N.L.R.B. at 928 n.1, 930.  Hawaiian withdrew its assent to the Tentative Agreement on November 2 and 3, 2008, when Hawaiian

representatives contacted Union representatives and explained that the Tentative Agreement had a valuation error, that the carrier would not honor the Tentative Agreement, and that the parties should return to the bargaining table.  (Feb. 23, 2009 Tr. 36:22-37:15, 58:16-18 (Shults Test.), 88:19-24, 88:25-89:6 (Kaneshiro Test.), 100:13-102:4 (Bumgarner Test.), 156:25-157:5 (Higa Test.); Union Ex. 3 at 1-2.)  The Union's members did not ratify the Tentative Agreement until November 6, 2008.  (Feb. 23, 2009 Tr. 36:22-37:2, 37:20-25 (Shults Test.); <u>see also</u> <u>id.</u> at 58:16-18 (Shults Test.).)  Thus, Hawaiian withdrew its assent to the Tentative Agreement before it was ratified by the Union's members.  <u>See</u> <u>Teledyne Specialty Equip.</u>, 327 N.L.R.B. at 928 n.1, 930 (ruling that the employer could withdraw its assent on the basis that it had made a valuation error, where ratification was a condition precedent to contract formation and ratification had not yet occurred).

21.  Accordingly, Hawaiian has shown a "likelihood of success" (1) as to its condition-precedent defense, (2) that the Tentative Agreement is therefore unenforceable and does not constitute the status quo, and (3) that it thus did not unlawfully abrogate or improperly refuse to implement the Tentative Agreement in contravention of RLA § 2 Seventh, 45

U.S.C. § 152 Seventh.[7/]  See Perfect 10, 508 F.3d at 1158; 29

U.S.C. § 107(a).  By the same token, this Court concludes that

the Union has not shown a likelihood of success on the merits of

its claim under RLA § 2 Seventh, 45 U.S.C. § 152 Seventh.

**III. Other Elements Under the the NLGA**

22.  Since the Union has not shown a likelihood of

success as to its claim that the Hawaiian has unlawfully violated

RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, it follows that the

Union is not excused from making the required showings under the

NLGA that its property will be substantially and irreparably

harmed in the absence of an injunction, that it has no adequate

remedy at law, and that the balance of hardships tips in its

favor.  See 29 U.S.C. § 107(b)-(d); Consol. Rail, 491 U.S.

at 302-03.  This Court will briefly address these elements

notwithstanding that it has determined that the Union has failed

to show a likelihood of success as to its claim under RLA § 2

Seventh, 45 U.S.C. § 152 Seventh, which essentially precludes the

issuance of an injunction.[8/]

_____

[7/] In view of that conclusion, this Court finds it
unnecessary to address the carrier's alternative argument that
the Tentative Agreement is voidable because there was a mutual or
unilateral mistake.  (See Mem. in Opp'n 28-31.)  Accordingly,
this Court has omitted certain findings of fact regarding the
mistake-of-fact issue that it would have made if it had addressed
the issue.

[8/] This Court does not address the fifth element under 29
U.S.C. § 107—i.e., whether "the public officers charged with the
(continued...)

A.  **Substantial and Irreparable Harm, and Adequate Remedy at Law**

23.   The Union asserts that its members would suffer irreparable harm if Hawaiian were allowed to unlawfully evade the Tentative Agreement because this litigation process could go on for years.  (Mem. in Supp. 34.)  The Union's claim of irreparable injury is premised upon the monetary damages that the Union's members are allegedly suffering.  Even assuming that these alleged monetary damages are substantial, they do not alone constitute irreparable injury.  See Elias v. Connett, 908 F.2d 521, 526 (9th Cir. 1990) (concluding that the plaintiff had offered no evidence in support of his allegations of irreparable harm because he failed to show that he would suffer more than mere monetary harm or financial hardship if he were denied relief); Cotter v. Desert Palace, 880 F.2d 1142, 1145 (9th Cir. 1989) ("Injuries compensable in monetary damages are 'not normally considered irreparable.'" (quoting Los Angeles Memorial Coliseum Com. v. Nat'l Football League, 634 F.2d 1197, 1202 (9th Cir. 1980))); see also Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) ("'The basis of injunctive relief in the

_____

[8]/(...continued)
duty to protect complainant's property are unable or unwilling to furnish adequate protection," 29 U.S.C. § 107(e)—because that element is "irrelevant" where, as here, "the harm is not of the kind that the police ordinarily prevent."  See Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union, 22 F.3d 8, 14 n.11 (1st Cir. 1994).

federal courts has always been irreparable harm and inadequacy of legal remedies.'" (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506 (1959))).

24.   Such damages can be readily and easily quantified and may potentially be recovered through a breach of contract claim, which constitutes an adequate remedy at law.   See Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) (explaining that an action at law for money damages is an adequate remedy for a breach of contract, unless the damages are clearly difficult to assess and measure).   Accordingly, the Union has an adequate remedy at law and has not shown irreparable injury.   See 29 U.S.C. §§ 107(b) & (d).

**B.   Balance of Hardships**

25.   The balance of hardships does not tip in the Union's favor.   See 29 U.S.C. § 107(c).   On the one hand, if an injunction were denied, the Union's members would still continue to be employed and receive pay and benefits under the existing Collective Bargaining Agreement.   (Feb. 23, 2009 Tr. 8:9-12, 39:4-6 (Shults Test.), 103:10-17, 134:11-15 (Bumgarner Test.); Hawaiian Ex. 101.)   And, if the Union were to ultimately prevail on the merits, then the remedy would be to implement the Tentative Agreement as of the date selected by this Court.   On the other hand, if an injunction were improvidently granted and

the Tentative Agreement were thereby improperly enforced, it would be very difficult to restore the status quo because the interisland coordinator positions would have been eliminated from the Collective Bargaining Agreement.  (<u>See</u> Union Ex. 2 at 1.)

26.  In summary, the Union has not shown (1) a likelihood of success as to its claim that Hawaiian unlawfully violated RLA § 2 Seventh, 45 U.S.C. § 152 Seventh, (2) that its members will suffer irreparable injury, (3) that it has no adequate remedy at law, or (4) that the balance of equities tips in its favor.  <u>See</u> 29 U.S.C. § 107.  This Court will therefore deny the Union's motion for a preliminary injunction.

<b><u>CONCLUSION</u></b>

In light of the foregoing, this Court denies the Union's motion for a preliminary injunction.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, April 8, 2009.



Alan C. Kay
Sr. United States District Judge

35

<u>Transport Workers Union of America v. Hawaiian Airlines, Inc.</u>, Civ. No. 08-00524 ACK-KSC:  Order Denying Plaintiff's Motion for a Preliminary Injunction